IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEVEN ALLEN, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: RDB 05-879 |
| LEONARD HAMM, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>MEMORANDUM OPINION</u>

This action arises out of a complaint filed by Baltimore City police officers Steven Allen, Bryan Bessling, Michael Cichowicz, William McKitrick, David Clauss, and Kevin Niebuhr ("Plaintiffs") against Leonard Hamm, Commissioner of the Baltimore City Police Department, Sean Malone, Interim Labor Commissioner of Baltimore City, George Balog, Director of the Department of Public Works, the Baltimore City Police Department, the Mayor of Baltimore, and the City Council of Baltimore ("Defendants").[1]   The complaint alleges that Defendants wrongfully discriminated against Plaintiffs on the basis of actual or perceived disabilities in violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"). Presently pending before this Court are cross-motions for summary judgment filed by the parties. Defendants argue that they are entitled to judgment as a matter of law because Plaintiffs cannot perform the essential functions of a Baltimore City police officer, *i.e.*, making a forcible arrest, firing a weapon of deadly force, and driving a vehicle under emergency conditions.  The parties' submissions have been reviewed and a hearing was conducted on February 10, 2006.  For the

---

[1]      Leonard Hamm, Sean Malone, and George Balog are named only in their official capacities.  (*See* Am. Comp. ¶¶ 18-20.)

reasons that follow, Defendants' Motion for Summary Judgment is GRANTED and Plaintiffs'

Cross-Motion for Summary Judgment is DENIED.

BACKGROUND

**I.     The Police Department's Light-Duty Policy.**

In the fall of 2003, a meeting was held to discuss the development of a Maintenance

Program for Limited/Light-Duty Personnel (the "Light-Duty Policy") for police officers in the

Baltimore City Police Department (the "Police Department").  (*See* Malone Affidavit ¶ 4.)  The

purpose of this policy was to address a manpower shortage caused by the fact that approximately

169 police officers—or five percent of the police force—were not available for full-duty police

work "due to chronic medical conditions and/or injuries of a permanent nature."  (*Id*.)  Attending

the meeting were representatives from the Police Department, the Baltimore City Fraternal Order

of Police Lodge #3 ("Fraternal Order of Police"), the Baltimore Police and Fire Pension System,

the City Solicitor's Office, Mercy Medical Clinic, and the Labor Commissioner's Office.  (*Id*. at

¶ 5.)

In August of 2004, after several meetings between the Fraternal Order of Police and the

Police Department, the Light-Duty Policy was implemented in the form of General Order Q-23.

(*See* Malone Affidavit ¶ 8.)  General Order Q-23 provides that "[a]ll sworn members of the

Department are required to be capable of performing the full duties and law enforcement

responsibilities of a sworn member to include the ability to make forceful arrests, to drive

vehicles under emergency conditions, and to qualify with a weapon."  (*Id*. at ¶ 9.)  It indicates

that while there are no permanent light-duty positions within the Department, a limited number

of light-duty assignments are available on a temporary basis—not to exceed 12 months— to

accommodate officers who are ill, injured, or under disciplinary investigation.  (*Id*.)  In addition,

2

General Order Q-23 requires that any police officer who the Public Safety Infirmary ("PSI") determined is medically unqualified for full-duty status must apply for retirement benefits or return to full-duty status within a specific amount of time.  (*Id.*)

General Order Q-23 allows an officer to dispute any PSI determination that he is medically unqualified for full-duty status.  (Malone Affidavit ¶ 9.)  If the Police Department receives written certification from the officer's private physician that the officer is qualified to return to full-duty status or will be qualified to return to full-duty status within a reasonable period of time, then PSI must review the certification.  (*Id.* at Ex. 1, p. 1.)  If PSI agrees with the physician's certification, the officer will be returned to full-duty status.  (*Id.*)  If PSI disagrees with the certification, the officer and his private physician will confer with PSI and attempt to resolve the disagreement.  (*Id.*)  If no resolution is reached, the matter is referred to a mutually agreed-upon independent physician.  (*Id.*)  The medical director of PSI, however, makes the final determination regarding the officer's qualification to return to full-duty status.  (*Id.*)

After General Order Q-23 was implemented, the Fraternal Order of Police, the Police Department, and the Labor Commissioner's Office discussed how and when General Order Q-23 would be administered.  (Malone Affidavit ¶ 10.)  It was agreed that police officers would not be required to apply for retirement until City Council Bill 04-1545 was signed into law.  (*Id.* at ¶ 11.)  This bill, which was signed into law in December 2004, allowed police officers to file an application for a line-of-duty disability retirement benefit even if the officer could not satisfy the five-year-from-date-of-injury filing requirement.  (*Id.*)  City Council Bill 04-1545 was drafted by the Police Department, the Fraternal Order of Police, the Baltimore Police and Fire Pension System, the City Solicitor's Office, and the Labor Commissioner's Office.  (*Id.*)

In January 2005, the Police Department sent letters to those police officers whom PSI

3

determined were permanently unable to perform the duties of a police officer.  (Malone Affidavit ¶ 13.)  These letters stated:

> As you are aware, the Public Safety Infirmary has determined that you are unfit for duty as a police officer.  Pursuant to General Order Q-23, Maintenance Program for Limited/Light Duty Personnel ("Policy"), which became effective on August 17, 2004, you must take appropriate steps to separate yourself from the Police Department through retirement or other avenues.  The Policy requires that you either file for retirement benefits or make other arrangements to separate from the Department.  Your failure to do either will result in your employment with the police department being involuntarily terminated.  A copy of the Policy is enclosed.
>
> Please be further advised that, under the Policy, to the extent that you are currently assigned to a light duty position, your tenure in that position is temporary, not permanent, as the Policy has abrogated the Police Department practice of assigning personnel to permanent, full-time, light duty jobs which are within the job classification of police officer.  Consequently, any duties that you may carry out in a light duty capacity are no longer being performed as a police officer.

(Pls' Mot. Ex. 1.)  The letters also summarized the disability retirement benefits available under City Council Bill 04-1545.  (*Id.*)

In March 2005, as a result of negotiations among the Police Department, the Fraternal Order of Police, and the Labor Commissioner's Office, General Order Q-23 was amended and incorporated into the Fraternal Order of Police's contract with the City of Baltimore.  (Malone Affidavit ¶¶ 14-15.)  The following changes were made to General Order Q-23:  First, any police officer determined by PSI to be medically unqualified for full-duty status has 12 months from the date of that determination to return to full-duty status.  (*Id.* at ¶ 16.)  Second, in the case of line-of-duty injuries, PSI will not make any such determination prior to 12 months from the original date of injury.  (*Id.*)  Third, if a police officer's application does not result in a pension benefit, the officer shall be retained as a police officer in their current classification until the officer qualifies for a retirement benefit of 50% of his highest 18 months salary.  (*Id.*)  Fourth, if a

police officer's application results in a pension benefit, the officer shall retire.  (*Id.*)  Finally, the Fraternal Order of Police agreed not to encourage or finance litigation that seeks to challenge the revised version of General Order Q-23.  (*See* Malone Affidavit Ex. 2, p. 3.)

## II.   Plaintiffs Allen, Bessling, Cichowicz, McKitrick, Clauss, and Niebuhr.

Plaintiff Steven W. Allen ("Allen") has been an officer with the Police Department since 1999.  (*See* Am. Compl. ¶ 4.)  In mid-2003, Allen tore his trapezius muscle.  (*Id.*)  Since that date, Allen has been unable to open a door, lift more than a few pounds, run, or sleep through the night.  (*Id.*)  In addition, household chores, such as cleaning, vacuuming, taking out the garbage and walking the dog have become impossible.  (*Id.*)  Allen has held light-duty positions with the Police Department since mid-2003, was asked to apply for retirement benefits or return to full-duty status in accordance with General Order Q-23, and has filed or is in the process of filing for retirement benefits.  (*See* Am. Compl. ¶ 4; Ambrose Affidavit ¶¶ 9-11.)

Plaintiff Bryan Bessling ("Bessling") has been an officer with the Police Department since 1980.  (*See* Am. Compl. ¶ 5.)  In the late 1980s, Bessling was diagnosed with diabetes. (*Id.*)  In the 1990s, he was diagnosed with hypertension.  (*Id.*)  In 1998, he injured his rotator cuff and both knees.  (*Id.*)  In 2002, he was diagnosed with coronary heart disease and injured in a car accident.  (*Id.*)  Bessling cannot drive, run, walk more than four blocks, squat, kneel, sit for more than 15 minutes at a time, or stand for more than five to eight minutes at a time.  (*Id.*) Bessling has held light-duty positions with the Police Department since early-2002, was asked to apply for retirement benefits or return to full-duty status in accordance with General Order Q-23, and has filed or is in the process of filing for retirement benefits.  (*See* Am. Compl. ¶ 5; Ambrose Affidavit ¶¶ 9-11.)

Plaintiff Michael W. Cichowicz ("Cichowicz") has been an officer with the Police

5

Department since 1984.  (*See* Am. Compl. ¶ 6.)  In 1991, he injured himself when he slipped and fell on duty.  (*Id*.)  Between 1991 and 2002, he had several surgeries on his knees, hips, and back.  (*Id*.)  In 2002, he broke the greater trochanter of his right hip.  (*Id*.)  Cichowicz cannot run, kneel, bend, squat, walk for more than five minutes, sit or stand uninterrupted for more than 30 minutes, or lift more than five or ten pounds.  (*Id*.)  Cichowicz suffers from pain that tremendously interferes with his sleep.  (*Id*.)  Cichowicz has held light-duty positions with the Police Department since approximately September 2002, was asked to apply for retirement benefits or return to full-duty status in accordance with General Order Q-23, and has filed or is in the process of filing for retirement benefits.  (*See* Am. Compl. ¶ 6; Ambrose Affidavit ¶¶ 9-11.)

Plaintiff William B. McKitrick ("McKitrick") has been an officer with the Police Department since 1993.  (*See* Am. Compl. ¶ 8.)  In 2001, he was diagnosed with ulcerative colitis.  (*Id*.)  In 2002, his large intestine was removed.  (*Id*.)  As a result, McKitrick must have immediate access to a restroom at all times.  (*Id*.)  McKitrick has held light-duty positions with the Police Department since early 2001, was asked to apply for retirement benefits or return to full-duty status in accordance with General Order Q-23, and has filed or is in the process of filing for retirement benefits.  (*See* Am. Compl. ¶ 8; Ambrose Affidavit ¶¶ 9-11.)

Plaintiffs David F. Clauss ("Clauss") and Kevin Niebuhr ("Niebuhr") allege that "[i]n spite of several injuries, at all times, [they are] able and [were] performing the essential functions of a police officer."  (*See* Am. Compl. ¶¶ 7, 9.)  Clauss and Niebuhr have held light-duty positions with the Police Department, were asked to apply for retirement benefits or return to full-duty status in accordance with General Order Q-23, and have filed or are in the process of filing for retirement benefits.  (*See* Ambrose Affidavit ¶¶ 9-11.)

### III.    Procedural History.

On March 31, 2005, Plaintiffs filed a Complaint against Defendants in this Court.[2]  On

April 20, 2005, Defendants filed their Motion for Summary Judgment.[3]  On June 24, 2005,

Plaintiffs filed their Motion to Amend Complaint and Cross-Motion for Summary Judgment.  On

July 8, 2005, Defendants filed their Motion to Stay Consideration of Plaintiffs' Motion to

Amend Complaint.  At the February 10, 2006 hearing, this Court granted Plaintiffs leave to file

their Amended Complaint.[4]  Discovery has not been taken.

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil

Procedure when there is no genuine issue as to any material fact, and the moving party is plainly

entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[2]       The initial complaint named 30 individuals, on behalf of themselves and others similarly situated, as plaintiffs in this case.  Before the hearing, 23 plaintiffs voluntarily dismissed their claims against Defendants.  At the hearing, counsel for Plaintiffs clarified that this matter is no longer being pursued as a class action and confirmed that another named plaintiff—Melissa D. Williams—also voluntarily dismissed her discrimination claims.  As a result, only six plaintiffs remain in this case: Allen, Bessling, Cichowicz, McKitrick, Clauss, and Neibuhr.

[3]       Although this motion is titled "Defendants' Motion for Summary Judgment," counsel for Plaintiffs (in papers filed with this Court) and counsel for Defendants (at the hearing) refer to this motion as a Motion to Dismiss Or, in the Alternative, for Summary Judgment.  The Court treats this motion as one for summary judgment because Defendants' arguments require that the Court consider matters outside the pleadings.  *See* Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997).

[4]       At the hearing, counsel for both parties represented that Plaintiffs' Amended Complaint does not affect the parties' pending cross-motions for summary judgment and Defendants withdrew their opposition to Plaintiffs' Motion to Amend Complaint.  Plaintiffs' counsel explained that the purpose of amending their complaint is threefold: (1) identify the reduced number of plaintiffs in this case, (2) allege that Plaintiffs were "perceived as disabled" by the Department, and (3) clarify that Plaintiffs are no longer pursuing this matter as a class action or seeking injunctive relief.

242 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369  U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir.2005). However, the opponent must bring forth evidence upon which a reasonable fact finder could rely, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  *Anderson*, 477 U.S. at 252.

As there are pending cross-motions for summary judgment, this Court applies the same standards of review.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve issues of material facts on a motion for summary judgment—even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215 (1985).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170,

172 (D. Md. 1985).  "[B]y the filing of a motion [for summary judgment] a party concedes that

no issue of fact exists under the theory he is advancing, but he does not thereby so concede that

no issues remain in the event his adversary's theory is adopted."  *Nafco Oil & Gas, Inc. v.*

*Appleman*, 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer*, 684 F.2d 62, 68

n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its

own motion.").  However, when cross-motions for summary judgment demonstrate a basic

agreement concerning what legal theories and material facts are dispositive, they "may be

probative of the non-existence of a factual dispute."  *Shook v. United States*, 713 F.2d 662, 665

(11th Cir. 1983).

DISCUSSION

**I.     Defendants' Motion for Summary Judgment.**

      **A.     Standard Under ADA.**

As a preliminary matter, it is unclear whether Plaintiffs' employment discrimination

claims are brought under Title I[5] or II[6] of the ADA or both.  (*See*, *e.g.*, Am. Compl. ¶ 42

(alleging violation of Title II); Pls' Mot. pp. 10-11 (legal argument based on Title I).)  Whether

Title I or II governs discrimination claims is often contested because Title I incorporates

administrative prerequisites that are not required under Title II.  *See* 42 U.S.C. §§ 12117(a) &

---

[5]     Title I of the ADA provides in relevant part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

[6]     Title II of the ADA provides in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

2000e-5 (requiring that an employee file a charge of discrimination with the EEOC before filing a complaint in federal court).

This Court need not decide whether Title II of the ADA permits Plaintiffs to bring employment discrimination claims against the Police Department.  First, Plaintiffs' compliance with Title I administrative prerequisites is no longer at issue.[7]  Second, although the United States Court of Appeals for the Fourth Circuit has not directly addressed the issue,[8] it has on at least one occasion allowed an individual to bring an employment discrimination claim under Title II of the ADA.  *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995).  Third, regulations promulgated under Title II adopt Title I standards for purposes of evaluating employment discrimination claims against public entities.  *See* 28 C.F.R. § 35.140. Accordingly, this Court assumes without deciding that Plaintiffs may bring employment discrimination claims against the Police Department under Title II, and analyzes those claims under the language and precedent of Title I of the ADA.  *See* 28 C.F.R. § 35.140.

**B.**     *Prima Facie* **Case.**

To establish a violation of Title I of the ADA or § 504 of the Rehabilitation Act ("RA"),[9]

---

[7]     Plaintiffs' counsel represents that the EEOC has issued right-to-sue letters to each of the remaining Plaintiffs.  At the hearing, Defendants agreed that their argument with respect to exhaustion of administrative remedies is now moot as to Plaintiff Niebuhr.

[8]     There is a split among the United States Courts of Appeals who have considered whether employment discrimination claims against public entities are available under Title II. *See*, *e.g.*, *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 n. 1 (2001) (acknowledging split but declining to resolve whether "Title II of the ADA, dealing with the 'services, programs, or activities of a public entity,' 42 U.S.C. § 12132, is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject.") (citations omitted).

[9]     Section 504 of the RA provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified to receive the employment or benefit in question, and (3) he was excluded from the employment or benefit, or otherwise discriminated against, on the basis of his disability.  *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (citing *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir.1999); *Doe v. Univ. of Md*, 50 F.3d at 1264-65 & n. 9)).

Initially, there are genuine issues of material fact with respect to the questions of disability as they relate to each of the remaining six Plaintiffs in this case.  (*Compare* Defs' Mot. p. 9 ("Plaintiffs are not 'disabled' within the meaning of the ADA because they admit—indeed, proudly assert—their ability to perform many jobs.") *with* Pls' Mot. p. 3 (submitting opinion from vocational expert that four Plaintiffs "are substantially limited in the major life activity of working in that they can perform only 11-60.6% of the jobs available in the labor market.") and pp. 6-7 (alleging that all Plaintiffs were perceived as disabled by the Police Department).) Accordingly, viewing the facts in the light most favorable to Plaintiffs on Defendants' motion for summary judgment, this Court concludes that Plaintiffs have satisfied the first element of proof.

However, the precise issue in this case is whether Plaintiffs are "otherwise qualified" for the job of police officer.  As a result, this Court must decide whether Plaintiffs could perform the essential functions of the job at issue, *i.e.*, functions that bear more than a marginal relationship to that job, and if not, whether any reasonable accommodation by the employer would enable them to perform those functions.  *See* 42 U.S.C. § 12111(8); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).

---

program or activity receiving Federal financial assistance . . ."  29 U.S.C. § 794(a).  *See also* 29 U.S.C. § 794(d) (adopting standards applied in Title I of ADA for purpose of determining "whether this section has been violated in a complaint alleging employment discrimination . . .").  Accordingly, this Court's analysis of Plaintiffs' claims under the language and precedent of Title I of the ADA applies with equal force to Plaintiffs' claims under the RA.

**1.     Essential Functions.**

The essential functions of a job are the "fundamental job duties" of the position.  29

C.F.R. § 1630.2(n)(1).  A job function may be considered essential because, among other

reasons, the position exists to perform that function, there is a limited number of employees to

whom that function can be assigned, or the function is so specialized that the employee was

hired specifically to perform it.  29 C.F.R. § 1630.2(n)(2).  Evidence of whether a particular

function is essential includes:

> (i)     The employer's judgment as to which functions are
>         essential;
> (ii)    Written job descriptions prepared before advertising or
>         interviewing applicants for the job;
> (iii)   The amount of time spent on the job performing the
>         function;
> (iv)    The consequences of not requiring the incumbent to
>         perform the function;
> (v)     The terms of a collective bargaining agreement;
> (vi)    The work experience of past incumbents in the job; and/or
> (vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Defendants' analysis on the issue of essential functions is guided by the factors set out in

29 C.F.R. § 1630.2(n)(3).  For example, Defendants establish that the Police Department has

determined that the "essential functions of a police officer include the ability to make forceful

arrests, to operate a vehicle under emergency conditions and to qualify with a weapon."

(Ambrose Affidavit ¶ 6.)  Defendants note that the Police Department views these functions as

essential at least in part because of fundamental "public and officer safety" concerns.  (*See*

Ambrose Affidavit ¶ 4.)  These concerns led the Police Department to develop and implement

the Light Duty Policy, which requires that, *inter alia*, all officers be capable of making an arrest,

operating a vehicle, and firing a weapon.  (*See* Malone Affidavit ¶ 4.)  Finally, Defendants point

out that the Fraternal Order of Police has incorporated the Light-Duty Policy into its contract with the City of Baltimore.  (*See* Malone Affidavit ¶ 15.)

Defendants also emphasize this Court's prior decision in *Champ v. Baltimore County*, 884 F. Supp. 991 (D. Md. 1995), the facts of which are remarkably similar to this case.  In 1976, an off-duty motorcycle accident rendered Baltimore County police officer James Champ's upper left arm useless.  *Id*.  When Champ returned to work later that same year, and for the 16 years that followed, he was assigned to various light-duty positions because of his arm.  *Id*.  In 1992, the Chief of Police determined that budgetary constraints required removing those officers who could not perform the full duties of a police officer.  *Id*.  As a result, all officers who had remained on light-duty assignment for more than 251 days were given the right to seek medical retirement, service retirement, a transfer into another position with the County service, a leave of absence, or resignation.  *Id*.  In 1992, Champ was placed on disability retirement.  *Id*.

Champ's suit alleged that the Baltimore County Police Department violated the ADA and RA by placing him on disability retirement due to the loss of use of his left arm.  *Champ*, 884 F. Supp. at 991.  This Court found that Champ failed to establish a *prima facie* case under the ADA or RA because he could not prove that he was "otherwise qualified" for the job in question.  *Id*. at 1000.  In particular, the Court found that no genuine dispute existed with respect to Champ's inability to perform the essential functions of a police officer in Baltimore County, which included making a forcible arrest, driving a motor vehicle under emergency conditions, and qualifying with a weapon.  *Id*. at 996-98.  Defendants argue that the instant case is governed by this Court's prior decision in *Champ* and that, as a result, summary judgment for Defendants is appropriate.

Plaintiffs' primary response to these arguments is that discovery is needed to determine

which job functions are essential in this case.[10]  Plaintiffs emphasize that "'[w]hether a particular function is essential is a factual determination that must be made on a case by case basis.'" *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 279 (3rd Cir. 2001) (quoting 29 C.F.R. pt. 1630, App. 1630.2(n)).  Plaintiffs also note that *Champ* and similar cases are "instructive at best in what remains a fact and circumstances-specific inquiry; they are not 'precedents' prescribing the essential qualifications for employment as a police officer."  *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 290 (S.D.N.Y. 2004).  Finally, Plaintiffs submit an affidavit pursuant to Fed. R. Civ. P. 56(f) in an attempt to set out reasons for allowing discovery on this and other matters. (*See* Pls' Mot. Ex. 18.)

After carefully considering Plaintiffs' arguments, caselaw, and Rule 56(f) affidavit, this Court finds that discovery on this matter would not lead to any genuine issues of material fact and is therefore unnecessary.  Accordingly, for reasons explained below, this Court denies Plaintiffs' request for such discovery.  *See Strag v. Board of Trustees*, 55 F.3d 943, 954 (4th Cir. 1995) (denial of Rule 56(f) motion generally appropriate "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."); *see also Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")

First, Plaintiffs do not challenge critical evidence submitted by the Defendants on the

---

[10]     Plaintiffs maintain that the essential functions analysis in this case should focus on the functions of the light-duty positions to which Plaintiffs were reassigned, not on the position of police officer.  The Court rejects this argument in light of the Police Department's requirement that *all* police officers, even those in administrative or supervisory positions, must be capable of making an arrest, driving a vehicle, and firing a weapon.  Accordingly, the relevant inquiry in this case is the fundamental duties of the job of police officer. *Cf. Champ*, 884 F. Supp. at 998 n. 3.

matter of essential functions.  For example, Plaintiffs do not dispute that, in the judgment of the

Police Department, the essential functions of a police officer include making a forcible arrest,

firing a weapon of deadly force, and driving a vehicle under emergency conditions.  *Cf.* 29

C.F.R. § 1630.2(n)(3) (employer's judgment relevant to determination of essential functions).

Likewise, it is undisputed that the Fraternal Order of Police has incorporated the Light-Duty

Policy into its contract with the City of Baltimore.  (*See* Malone Affidavit ¶ 15.)  *Cf.* 29 C.F.R. §

1630.2(n)(3) (collective bargaining agreement relevant to determination of essential functions).

Finally, Plaintiffs do not take issue with the Police Commissioner's authority to determine the

physical qualifications for serving as a police officer by, for example, requiring that all officers,

even those in supervisory or administrative roles, be capable of full-duty deployment.  *Cf.* 29

C.F.R. § 1630.2(iii)-(iv) & (v)(vi) (work experience, time performing function, and

consequences of not requiring function are relevant to determination of essential functions).

Second, this Court finds that the discovery requested by Plaintiffs would not give rise to

any genuine issues of material fact on the matter of essential functions.  Plaintiffs' requests

generally fall into two categories: discovery related to the Police Department's *application* of its

requirement that all officers be able to make forceful arrests, drive vehicles under emergency

conditions, and qualify with a weapon, and discovery related to *job descriptions* for the position

of police officer in Baltimore City.[11]  The first category—concerning the application of

standards—is designed to address whether Police Department policies are a pretext for excluding

disabled individuals.[12]  Accordingly, Plaintiffs seek to discover the number of officers who have

---

[11]     This Court finds that Plaintiffs' other requests for discovery—on such topics as
the Police Department's increased use of helicopters, use of lighter weapons, and greater reliance
on the U.S. Armed Forces and organizations such as the FBI since the 9/11 attacks—concern
information that is irrelevant and unnecessary to the issues in this case.

[12]     Solely for purposes of evaluating Plaintiffs' Rule 56(f) affidavit as it relates to the
application of Police Department standards, this Court assumes that Plaintiffs can satisfy their
initial burden of proving a *prima facie* case under the ADA and thereby reach the issue of

not had to make forcible arrests, fire weapons, or operate a vehicle under emergency conditions in the course of their day-to-day duties over the past 15 years.  (*See* Rule 56(f) Affidavit, p. 2.)  This type of discovery, however, would not lead to any genuine disputes.  The issue in this case is whether officers are *capable* of performing certain fundamental job functions, not whether they have in fact been required to do so.  Even if discovery showed that police officers working in administrative positions were never called upon to make forcible arrests, that fact would not be material to any reasonable jury's determination of the fundamental job duties of a police officer in Baltimore City.  No reasonable jury could find that the Police Department exceeded the broad bounds afforded it under the ADA to decide as an employer that being capable of making forcible arrests, driving vehicles under emergency conditions, and firing weapons of deadly force are essential qualifications for serving as a police officer.

The lack of any need for discovery on the application of Police Department policies and standards is confirmed by evidence submitted by Plaintiffs.  For example, an affidavit from Plaintiff Niebuhr provides that full duty officers working in light duty capacities "had to perform one tour of duty approximately every so often."  (Niebuhr Affidavit ¶ 5.)  Another affidavit, this one from Plaintiff McKitrick, states that since receiving letters describing General Order Q-23, "approximately 50 or so officers returned from light duty to full duty."  (McKitrick Affidavit ¶ 26.)  These affidavits confirm that officers are sometimes redeployed in a full-duty capacity even when working in a light-duty capacity, and that the Light-Duty Policy was not a mere pretext for eliminating all officers working in a light duty capacity.

The second category of requested discovery—concerning job descriptions—also would

---

pretext.  *See Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (applying *McDonnell Douglas* burden-shifting framework to wrongful discharge claim brought under the ADA).

not give rise to any genuine issues of material fact.  First, there is no dispute that the Light Duty

Policy "has abrogated the Police Department practice of assigning personnel to permanent,

full-time, light duty jobs which are within the job classification of police officer."  (Pls' Mot. Ex.

1.)  Second, Plaintiffs present no argument, caselaw, or other support to suggest that the

Commissioner lacks the authority to determine that officers working in a light-duty capacity

must return to work as full-duty police officers or retire, or that all police officers must be

capable of performing certain fundamental job duties.  As a result, even if discovery showed that

the Police Department provided permanent, light-duty "police officer" positions before the

Light-Duty Policy was implemented, that fact would not be material to any determination of the

fundamental job duties of a police officer in this particular case.  Again, discovery would simply

not lead to evidence from which a reasonable jury could conclude that the Police Department

exceeded its authority under the ADA by deciding that making forcible arrests, driving vehicles

under emergency conditions, and firing weapons of deadly force are fundamental to the job of

police officer.  Accordingly, this Court denies Plaintiffs' request under Fed. R. Civ. P. 56(f) for

discovery on the matter of essential functions.[13]  *Strag*, 55 F.3d at 954; *Anderson*, 477 U.S. at

248.

There is no dispute with respect to the authority of the Police Commissioner to make

decisions regarding personnel matters.  Furthermore, there is no dispute that the determination of

the essential functions included input from the Fraternal Order of Police.  The Plaintiffs have

---

[13]     The parties in the *Champ* case conducted discovery before filing cross-motions
for summary judgment.  *See Champ*, 884 F. Supp. at 994 & 997.  In contrast, the parties in this
case filed cross-motions for summary judgment before conducting any discovery.  Given the
undisputed facts in this case and the Plaintiffs' failure to demonstrate any need for discovery on
the matter of essential functions, summary judgment is appropriate despite the early procedural
stage of this case.

failed to demonstrate a need for discovery on the matter of essential functions.  Accordingly, this Court finds that no genuine dispute exists with respect to the essential functions of a police officer in Baltimore City, *i.e.*, making a forcible arrest, driving a motor vehicle under emergency conditions, and qualifying with a weapon.

### 2. Plaintiffs' Ability To Perform Essential Functions.

It is undisputed that three Plaintiffs—Allen, Bessling, and Cichowicz—cannot perform the essential functions of a Baltimore City police officer.  (*See*, *e.g.*, Pls' Mot. pp. 3-6 & Exs. 3, 4, 7 & 9.)[14]  With respect to the remaining Plaintiffs—Clauss, Niebuhr, and McKitrick—this Court finds that, for reasons explained below, there is no genuine dispute that they are each incapable of performing the fundamental job duties at issue here.

In Plaintiffs' initial complaint, Clauss, Niebuhr, and McKitrick allege physical limitations that would prevent them from making a forcible arrest, driving a motor vehicle under emergency conditions, and qualifying with a weapon.  For example, Clauss contends that, after two operations on his back and a heart attack, he is left short of breath by excessive exertion, experiences difficulty lifting, and sometimes suffers from confusion.  (Compl. ¶ 12.)  Niebuhr asserts that, after falling down a flight of stairs and injuring his lower back and right elbow, he cannot run fast, must take frequent breaks at work to alternate between sitting and standing,

---

[14]     Plaintiffs Bessling and Cichowicz state in direct terms that they cannot perform the essential functions of a police officer.  (*See* Bessling Affidavit ¶ 8 ("I am unable to make a forcible arrest, drive a vehicle under emergency conditions or fire a weapon."); Cichowicz Affidavit ¶ 21 ("I am unable to make a forcible arrest.").)  Although Plaintiff Allen does not explicitly aver that he cannot perform these functions, Plaintiffs do not dispute that he is incapable of making a forcible arrest, driving a vehicle, or firing a weapon.  (*See*, *e.g.*, Pls' Mot. pp. 3-6.)  Allen's description of his physical limitations, moreover, places his inability to perform the fundamental job duties at issue here beyond reasonable dispute.  (*See*, *e.g.*, Allen Affidavit ¶¶ 5 ("I can't lift at all.") & 6 ("I am unable to perform any job involving physical labor.").)

cannot walk far, has great difficulty driving, cannot perform most housework, sometimes only gets three to four hours of sleep, and cannot carry heavy items. (*Id*. at ¶ 24.) McKitrick asserts that his large intestine was removed after being diagnosed with ulcerative colitis, and that severe fecal urgencies require that McKitrick be near a bathroom at all times. (*See* Compl.¶ 21; McKitrick Affidavit ¶¶ 16-20.) As a result, McKitrick reports great difficulty in driving, severe sleep problems, and a substantially limited ability to perform daily activities and manual tasks. (*Id*.)

In documents submitted after Defendants filed their Motion for Summary Judgment, however, Plaintiffs made substantially different allegations. For example, Clauss and Niebuhr allege in an amended complaint and separate affidavits that "[i]n spite of several injuries, at all times, [they are] able and [were] performing the essential functions of a police officer." (Am. Compl. ¶¶ 7, 9; *see also* Clauss Affidavit ¶ 11; Niebuhr Affidavit ¶ 3.) Similarly, McKitrick contends that he is "able to make a forcible arrest, drive a vehicle under emergency conditions, or fire a weapon." (McKitrick Affidavit ¶ 6.) Finally, Niebuhr's doctor opines that although there is nothing precluding Niebuhr from operating a weapon or driving a vehicle in emergency conditions, additional information is needed to determine whether Niebuhr can make a forceful arrest. (*See* McGovern Affidavit ¶ 4.)

After carefully reviewing Plaintiffs' amended complaint and the accompanying affidavits, this Court finds that there is no genuine issue of material fact with respect to Clauss, Niebuhr, and McKitrick's inability to perform the essential functions of a police officer. First, neither Clauss, Niebuhr, nor McKitrick disclaim any of the specific physical limitations that they

alleged in Plaintiffs' initial complaint.[15]  Second, simply stating in pleadings and affidavits that

they are able to perform the essential functions of a police officer, without specific facts to

support such statements, is conclusory and insufficient to establish a genuine issue of material

fact.  *See*, *e.g.*, *Guinness PLC v. Ward*, 955 F.2d 875, 901 (4th Cir. 1992) ("the mere placement

of . . . conclusory allegations and speculative assertions into affidavits or declaration without

further legitimate support clearly does not suffice" to overcome summary judgment); *Lujan v.*

*Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) ("replac[ing] conclusory allegations of the

complaint... with conclusory allegations of an affidavit" insufficient to overcome summary

judgment).

Finally, this Court finds that the affidavit from Dr. Kevin McGovern—Niebuhr's private

physician—fails to establish a genuine issue with respect to Niebuhr's ability to make a forcible

arrest.  Although Dr. McGovern opines that Niebuhr is capable of firing a weapon and driving a

vehicle under emergency conditions, Dr. McGovern states that, with respect to making a forcible

arrest, he "need[s] more information with respect to that which the police department categorizes

'forcible' before I could render an opinion."  (McGovern Affidavit  4.)  In light of Niebuhr's

undisputed physical limitations—including the fact that Niebuhr cannot run fast, cannot walk far,

---

[15]        Plaintiffs do not dispute that they decided to file for retirement benefits instead of
requesting that the Police Department reconsider its assessment that Plaintiffs are unable to
perform the essential functions of a police officer.  (*See* Ambrose Affidavit  10; Malone
Affidavit Ex. 2.)  General Order Q-23 created a process for allowing Plaintiffs to dispute any
determination made by the Public Safety Infirmary that the Plaintiffs are medically unqualified
for full-duty status.  *See*, BACKGROUND, § I, *supra*.  Plaintiffs have submitted evidence,
moreover, establishing that numerous officers working in a light-duty capacity took advantage of
this process.  (*See* McKitrick Affidavit ¶ 26 (averring that, since receiving letters describing
General Order Q-23, "approximately 50 or so officers returned from light-duty to full duty.").)
Plaintiffs cannot now blame Defendants for failing to reconsider their physical limitations when
Plaintiffs decided to forgo such reconsideration in order to pursue retirement benefits.  *Cf.*
*Champ*, 884 F. Supp. at 997 n. 2.

cannot perform most housework, cannot carry heavy items, and must take frequent breaks at work to alternate between sitting and standing—this Court concludes that no reasonable jury could find that Niebuhr is capable of making a forcible arrest.  Accordingly, for the reasons stated above, this Court finds that there is no genuine issue that each of the Plaintiffs are unable to perform the essential functions of a Baltimore City police officer.

<strong>3.      Reasonable Accommodation.</strong>

Under the ADA, an employer is required to make "reasonable accommodations" to the known physical or mental limitations of a qualified disabled individual unless the accommodation would impose an undue hardship on the operation of the business.  42 U.S.C. § 12112(b)(5)(A).  A reasonable accommodation may include "job restructuring, part-time or modified work schedule, reassignment to a vacant position, [and] acquisition or modification of equipment or devices . . ."  42 U.S.C. § 12111(9)(B).

In this case, the accommodation that Plaintiffs seek is limited to "allowing plaintiffs to continue to work in their permanent, light duty positions."  (*See*, *e.g.*, Am. Compl. ¶¶ 40(d) & 42(d).)  This is not a "reasonable accommodation" because permanent, light-duty positions would effectively eliminate the essential functions of making a forcible arrest, operating a vehicle under emergency conditions, and firing a weapon.  *See*, *e.g.*, *Hall v. U.S. Postal Service*, 857 F.2d 1073, 1078 (6th Cir. 1988) (accommodation is "unreasonable if it requires elimination of an essential duty."); *see also Hill v. Harper*, 6 F. Supp. 2d 540, 544 (E.D. Va. 1998) (jail deputy's request for accommodation by permanently placing him in control room unreasonable because it "eliminated the 'essential function' of being able to rotate through the various duty posts"); *Johnson v. State of Md.*, 940 F.Supp. 873, 878 (D. Md. 1996) (correctional officer's request for limited duty accommodation unreasonable in part because correctional officer's

21

inability to use a firearm to help control the prison population threatens safety of other correctional officers and the public.) (citing *Champ*, 884 F. Supp. at 995).  Accordingly, this Court concludes that no reasonable jury could find that Plaintiffs are "otherwise qualified" individuals with a disability entitled to protection under the ADA.

## II.    Plaintiffs' Cross-Motion for Summary Judgment.

Plaintiffs argue that they are entitled to judgment as a matter of law based on the following argument:

> [T]he proper actions for the city would have been on a case by case basis to determine that which each officer they perceived as disabled would have been able to perform and whether an accommodation could have been made on an individual basis.  This would have resulted undoubtedly, in at least seven officers retaining their jobs on a permanent basis.  Instead, the city didn't do that.  They closed the entire department . . . They lumped all officers who they perceived as "disabled" into one broad category and used an "essential functions" argument regarding duties not required of these officers for a number of years.  That is a blatant violation of the ADA.

(Pls' Mot. p. 21.)  Plaintiffs' argument fails at a basic level because it assumes that the essential functions at issue relate to the light-duty positions that Plaintiffs occupied before the Light-Duty Policy, not the job of police officer.  This analysis is mistaken for reasons explained above.  *See* DISCUSSION § I.B.1.

In addition, this Court rejects Plaintiffs' misguided contention that Defendants failed to make a case-by-case assessment.  The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position. *See* 29 C.F.R. Pt. 1630, App., Background.  In their motion for summary judgment, Defendants established that this individualized inquiry was made *with respect to Plaintiffs' ability to perform the job of police officer*.  For example, each of the Plaintiffs was sent a letter in January 2005 that began: "As you are aware, the Public Safety Infirmary has determined that you are unfit for

duty as a police officer."  (Pls' Mot. Ex. 1; Malone Affidavit  13; *see also* Ambrose Affidavit  10

(averring that all of the Plaintiffs "have been determined to be medically unfit to perform the full

duties of police officers by PSI . . .").)  Plaintiffs do not contest these claims.  Instead, Plaintiffs

allege that Defendants failed to make a case-by-case assessment *with respect to Plaintiffs' ability*

*to perform the light-duty positions that Plaintiffs occupied before the Light-Duty Policy.*[16]

Accordingly, this Court finds that there is no genuine dispute that Defendants have complied

with the ADA's mandate of individualized inquiry in determining whether Plaintiffs' physical

limitations disqualified them from the position of police officer.  *See* DISCUSSION §§ I.B.1

(relevant functions are those of police officer, not light-duty positions) & I.B.2 (Plaintiffs

decided to file for retirement benefits instead of requesting that the Police Department reconsider

its assessment that each Plaintiff cannot perform essential functions), *supra*.

Ultimately, Plaintiffs' case fails because it refuses to recognize the authority of the Police

Department to manage its personnel and internal operations:

> The laws of the State of Maryland and the City of Baltimore, as well
> as well-established public policy, recognize that government
> employers, especially police departments, must have wide discretion
> and control over the management of their personnel and internal
> operations. This is particularly true in a police department, a
> paramilitary department, where internal discipline and public safety
> require that a police commissioner be afforded broad discretion and
> authority to assign and reassign members of the department to
> various posts.

*Zombro v. Baltimore City Police Dept.*, 868 F.2d 1364, 1369-70 (4th Cir. 1989) (declining to

---

[16]     Plaintiffs' focus on light-duty positions is clear from their moving papers and
affidavits.  For example, Plaintiffs allege that "no City official ever called . . . any of the light
duty officers, sat them down, one by one, reviewed each individual officer's limitations, and
attempted to match that officer up with either an accommodation or assessing whether that
officer could continue in light duty."  (Pls' Mot. p. 19.)  Similarly, Plaintiff McKitrick contends
that the Police Department "never attempted to determine how many light duty positions doing
police work could remain open on a permanent basis."  (McKitrick Affidavit ¶ 25.)

recognize a § 1983 remedy in an age discrimination case).  The ADA does not prevent the Police

Commissioner from implementing the employment standards at issue in this case, provided of

course that resulting decisions are made on a case-by-case basis and not on the basis of

impairments.  *See*, *e.g.*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490-91 ("By its terms, the

ADA allows employers to prefer some physical attributes over others and to establish physical

criteria. An employer runs afoul of the ADA when it makes an employment decision based on a

physical or mental impairment, real or imagined, that is regarded as substantially limiting a

major life activity.").  In this case, there is no genuine dispute that the Police Department's

employment decisions were made on the basis of reasonable physical criteria applied on an

individualized basis.  As a result, no reasonable jury could find that the Police Department—by

determining that police officers working in light-duty capacities must return to work as full-duty

officers or retire, or that all police officers must be capable of making arrests, operating vehicles

under emergency conditions, or firing a weapon of deadly force—exceeded the broad bounds

afforded the Police Department under the ADA.

CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED

and Plaintiffs' Cross-Motion for Summary Judgment is DENIED.  A separate Order and

Judgment follows.

Dated: February 22, 2006                      /s/_____
                                              Richard D. Bennett
                                              United States District Judge